WILLIAM C. MOENING AND HARRY A. HECKMANN—COPARTNERS DOING BUSINESS UNDER THE NAME AND STYLE OF THE UNITED STATES DRILL HEAD COMPANY, PETITIONER, *v.* WAR CONTRACTS PRICE ADJUSTMENT BOARD, RESPONDENT.

Docket Nos. 413–R, 414–R.   Promulgated April 17, 1950.

*Robert S. Marx, Esq.*, and *John Paul Curry, Esq.*, for the petitioners.
*Ralph G. Cornell, Esq.*, for the respondent.

594

OPINION.

KERN, *Judge*: The respondent, by unilateral orders, had determined that the partnerships [3] of Drill Head and Machine Tool received excessive profits in the amounts of $95,000 and 25,000, respectively, under the provisions of the Renegotiation Act, as amended by section 701 of the Revenue Act of 1943, herein referred to as the "Renegotiation Act."

The petitioners raise two jurisdictional questions. The first question presented is whether Machine Tool and Drill Head, during the calendar year ended December 31, 1943, were "under the control of or controlling or under common control with" the other within the meaning of the Renegotiation Act. The second question is whether the product of Machine Tool is exempt from renegotiation as a "standard commercial article" within the meaning of the Renegotiation Act.

A decision in favor of petitioners on either of the two preliminary questions would render unnecessary any decision with respect to the amount, if any, of excessive profits. Both questions, however, must be decided in favor of respondent.

Respondent can make determinations validly in the present proceedings only if the renegotiable sales of Drill Head and Machine Tool may be combined to reach the jurisdictional minimum of $500,000, as required under section 403 (c) (6) of the Renegotiation Act, which states: "This subsection shall be applicable to all contracts and subcontracts, * * * unless * * * (B) the aggregate of the amounts received or accrued in the fiscal year by the contractor or subcontractor and all persons under the control of or controlling or under common control with the contractor or subcontractor, * * * do not exceed $500,000 * * *." See also Joint Regulations Manual (published January 27, 1948), par. 348.3 (4).

Petitioners contend that neither partner is under the control of or controls the other partner, and that both partners are not under common control of a third party; therefore, there is no ground for the aggregation of the renegotiable receipts of either the two businesses or the two partners.

We think petitioners' viewpoint is unduly limited. We have, in the instant case, two partnerships composed of the same equal and general partners, each of whom acts in partnership matters as a reciprocal agent and principal. Thus, each partnership is controlled by the two individuals as between whom there is a mutuality of rights and obligations characteristic of general partnership and justifying the paradox that each controls and is controlled by the other within the range of partnership matters. If the partnership businesses be con-

---

[3] See *Continental Chemical & Engineering Supply* v. *War Contracts Price Adjustment Board,* 11 T. C. 45.

sidered not as entities, but as associations of the individual partners, we are of the opinion that the reciprocal rights, obligations, and control existing as between the general partners and above referred to, compels a conclusion that there is a common control of the two part-. nerships. If the partnerships are considered as entities (see *Continental Chemical & Engineering Supply* v. *War Contracts Price Adjustment Board, supra*), the same conclusion results *a fortiori*. It would be contrary to reality to conclude that there was no common control of two business enterprises of each of which Moening and Heckmann were equal general partners.

The general intent of the Renegotiation Act is to return to the United States Government excessive profits made from war contracts.

The minimum jurisdictional amount set forth in the act is to relieve the administrators of the act from the burden of redetermining all excessive profits, regardless of the amount.. House Report No. 733, 78th Cong., 1st sess., p. 12.

The purpose of the "common control" clause in question is at least in part to prevent contractors from establishing, either in corporate or partnership form, a series of *ad hoc* business enterprises, each of which is to work on a phase of war contracts, in order to prevent the total receipts of the individual contractors derived from war contracts or subcontracts from reaching the jurisdictional minimum. See Senate Report No. 440, part 2, 80th Cong., 2d sess., p. 11.

In the present case, two general and equal partners constitute the common control of the two partnership businesses established by them and operating under fictitious names, and whose combined total renegotiable receipts exceed $500,000. Cf. *Southland Steel Co.* v. *War Contracts Price Adjustment Board*, 13 T. C. 652. Therefore, on the first jurisdictional issue, we decide in favor of respondent.

In connection with the second question raised with respect to jurisdiction, the statute provides:

[Section 403 (i) (4).] The Board is authorized, in its discretion, to exempt from some or all of the provisions of this section—

\*       \*       \*       \*       \*       \*       \*

(D) any contract or subcontract for the making or furnishing of a standard commercial article, if, in the opinion of the Board, competitive conditions affecting the sale of such article are such as will reasonably protect the Government against excessive prices.

Under section 403 (i) (2), the Board is authorized to interpret and apply the definition of "standard commercial article" contained in section 403 (a) (7) by regulation.

A "standard commercial article" is defined as an article which is (A) identical in every material respect with one manufactured and sold in general civilian, industrial, or commercial use prior to January 1, 1940; (B) which is identical in every material respect with one

having the same uses, or being manufactured and sold as a competitive product by more than one manufacturer; and (C) which is sold under a maximum price which is in effect under the Emergency Price Control Act of 1942, or which is sold at a price not in excess of the January 1, 1941, selling price.

Assuming, without deciding, that this Court has the authority to review the discretionary authority of the Board to exempt standard commercial articles from renegotiation, and that the hand-feed miller is such a standard commercial article, petitioners have not shown that competitive conditions were such as would reasonably protect the Government against excessive prices within the meaning of section 403 (i) (4), quoted above. In fact, the evidence in the instant case discloses unusually wide variations in the prices charged for their products by the several manufacturers of hand millers, indicating that whatever competition existed had little effect on prices. It is apparent from the record that the price of machine tools is not often determined by competitive conditions alone, but depends much upon the technical skill and ability of highly specialized artisans in the machine tool industry, as well as the precision and utility of the tool. This situation would, in part, account for the absence of any machine tools either as a class or individual article from the War Contracts Price Adjustment Board exemption list found in section 845 of the Renegotiation Regulations. In any event, the denial of exemption does not serve to shift the burden of proof from petitioners for purposes of these proceedings. Rules 64–I and 32 of Rules of Practice before The Tax Court of The United States. Under the circumstances, we can not say that petitioners have demonstrated that they are entitled to exemption from renegotiation under section 403 (i) (4) (D).

The ultimate problem is the amount of excessive profits.

Respondent determined that $95,000 and $25,000 of total renegotiable profits of $166,382.26, and $77,707.17 on renegotiable sales of $460,790.95 and $294,317.37 of Drill Head and Machine Tool, respectively, were excessive.

The first question is whether excessive profits are to be determined after an allowance for "salaries" to the partners. Respondent has conceded that some allowance for such an item is appropriate. See Regulations 382.2 (2); *Greaves* v. *War Contracts Price Adjustment Board*, 10 T. C. 886; *Grob Brothers* v. *Secretary of War*, 9 T. C. 495. His figure for both partners for both businesses aggregates $40,000.

We deem the respondent's proposed allowance as unreasonably low in view of extent and scope of the work of petitioners as well as their qualifications and the salaries they could command in comparable enterprises, and conclude as indicated by our findings of fact that aggregate salaries of $80,000 are appropriate and reasonable under all the circumstances.

This brings us to the broad question of determining the extent, if any, to which petitioners' profits were excessive. There are many pertinent factors [4] which must be interpreted in favor of petitioners. The price of the products, which was low compared to prices listed by competitors, remained the same; the factory and administrative costs were unusually low and were decreased during the war period; the partners met increased production schedules with their own capital, without certificates of necessity, and with the use of depreciated machines; the quantity and quality of the products were substantial contributions to the war effort; and the partners were highly competent and skilled, and worked day and night, without vacation, to manufacture the products in question.

Other factors show that, although the war situation increased sales and led to a proportionate reduction of the costs of each article sold, and a resultant increase of percentage of profits, there was no voluntary reduction of sales price; that there were few problems of reconversion; that although the character of the Drill Head machine was extremely complex, the operation of Machine Tool was predominantly the acceleration of production of its standard machine tool; that the pricing policy of petitioners adequately covered the standard risks of petitioners' operations; and that petitioners had nonrenegotiable sales comparable to average sales during the base period.

Upon a full consideration of the entire record and all the pertinent factors, including those urged by the contending parties, we have concluded that, in the year in question, Drill Head and Machine Tool received aggregate excessive profits of $65,000.

Reviewed by the Court.

*An order will be entered in accordance herewith.*